UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-61360-CIV-ROSENBAUM/SELTZER

CREDIT BUREAU SERVICES, INC., a
Florida corporation,

　　　　　　　　Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC., an Ohio corporation, and
CORELOGIC, INC., a Delaware corporation,

　　　　　　　　Defendants.

_____/

## ORDER ON DEFENDANTS' JOINT MOTION TO DISMISS
## AND JOINT MOTION TO TRANSFER VENUE

This matter is before the Court on Defendants Experian Information Solutions, Inc., and CoreLogic, Inc.'s Joint Motion to Dismiss [D.E. 20], Joint Motion to Transfer Venue [D.E. 29], and Joint Motion to Consider Joint Motion to Transfer Venue Before Joint Motion to Dismiss [D.E. 30]. The Court has reviewed all supporting and opposing filings and the record and has heard argument on all three motions. After careful consideration, the Court now denies the Joint Motion to Consider Joint Motion to Transfer Venue Before Joint Motion to Dismiss [D.E. 30] and grants the Joint Motion to Dismiss [D.E. 20] and the Joint Motion to Transfer Venue [D.E. 30], for the reasons set forth below.

## *I.  Background*

A.  Consumer Credit Reports and the Mortgage Industry

Experian Information Solutions, Inc. ("Experian"), is a "consumer reporting agency that

compiles and maintains files on consumers on a nationwide basis," as those terms are defined by Section 603(p) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681a.  D.E. 1 at ¶ 6.  The other two companies that engage in this same activity include only Equifax, Inc. ("Equifax"), and TransUnion, LLC ("TransUnion").  *Id.*

Experian, Equifax, and TransUnion, which are sometimes referred to as "repositories," supply consumer credit information to end users, such as banks, and to companies that resell the information to end users.  *See id.* at ¶ 35.  More specifically, consumer reporting agencies ("CRAs") purchase the credit information from the repositories, assemble or evaluate the information, and furnish it to end users.  *Id.* at ¶ 28 (quoting 15 U.S.C. § 1681a(f)).  Credit-report resellers are CRAs that "assemble and merge information contained in the database of another consumer reporting agency or multiple consumer reporting agencies . . . for purposes of furnishing such information to any third party" but "do[] not maintain a database of the assembled or merged information from which the new consumer reports are produced."  *Id.* at ¶ 32 (quoting 15 U.S.C. § 1681a(u)).

CRA resellers can sell information obtained from a single repository or from multiple repositories.  "[T]ri-merged credit reports" are specialized credit reports that include consumer credit data from all three repositories and that are sold at retail to qualified end users by CRA resellers.  *Id.* at ¶ 37.

In the mid-1990s, government-sponsored entities ("GSEs"), including the Federal National Mortgage Administration, the Federal Home Loan Mortgage Corporation, and agencies of the United States Department of Housing and Urban Development, introduced automated underwriting of the residential-real-estate-lending market.  *Id.* at ¶ 41.  The GSEs' underwriting standards require the use of tri-merge credit reports where feasible.  *Id.*

B.  The Events at Issue in This Case

This matter arises out of a dispute between Defendant Experian and Plaintiff Credit Bureau Services, Inc. ("CBS"), a former customer of Experian's and a CRA reseller of information obtained and maintained by Experian and its two competitor repositories.  Because tri-merged credit reports are, more or less, necessary for underwriting in residential real estate, CBS asserts, each of the three repositories whose information is required for the creation of a tri-merged credit report enjoys what is effectively monopoly market power.  *See* D.E. 1 at ¶¶ 41-42, 66 -67.  In order to maintain this alleged monopoly, CBS avers, Experian has engaged in conduct to discourage others either from becoming repositories or from lobbying the GSEs to relax the tri-merged credit report requirements. *See id.* at ¶¶ 44 - 66.

Essentially, CBS complains that in order to preserve its alleged monopoly position, Experian conspired with Defendant CoreLogic, Inc. ("CoreLogic"), a CRA reseller that competes with CBS, to knock out of the market approximately 87% of other CRAs that were previously in the business of selling tri-merged credit reports, thereby eliminating CoreLogic's competition.  As a payoff for this alleged plan, CoreLogic would neither attempt to enter the repository market nor try to convince the GSEs to dilute their tri-merged credit report requirement, and Experian would maintain its purported monopoly position in the tri-merged credit report supply market.

*1.  The Relationship Between Defendants Experian and CoreLogic*

In support of this theory, CBS traces the history of the relationship between Defendants Experian and CoreLogic.  According to the Complaint, in 2003, CoreLogic's predecessor, First American, operated the Credit Information Group ("CIG").  *Id.* at ¶ 14.  CIG consisted of several CRA resellers engaged in credit reporting.  *Id.*  In particular, CIG's mortgage credit-reporting

business, which consisted of First American Credco ("Credco"), a CRA retailer, was owned by First American Real Estate Solutions, LLC ("FARES"). *Id.*

On about June 5, 2003, CIG spun off some of its businesses, which became First Advantage Corporation ("First Advantage"), a diversified CRA reseller. *Id.* at ¶ 15. Almost two years later, on about March 22, 2005, First American initiated a transaction to transfer the rest of CIG to First Advantage, resulting in First American's obtaining of an 80% ownership interest in First Advantage. *Id.* at ¶ 16. In connection with this 2005 reorganization, First American soon thereafter acquired Experian Real Estate Services ("Experian Real Estate"), a mortgage CRA reseller and real-estate services company that had been wholly owned by Experian, to be organized as a subsidiary of Credco and owned by FARES. *Id.* at ¶ 17. At that point, Experian owned a 20% interest in FARES and enjoyed certain governance authority. *Id.* According to the Complaint, Experian agreed to refrain from competing with FARES in the retail mortgage credit-reporting business. *Id.* Experian later withdrew from FARES in December 2010. *Id.* at ¶ 18.

In the meantime, on about November 17, 2009, First American increased its ownership interest in First Advantage to 100% by acquiring the remaining outstanding equity in the company. *Id.* at ¶ 19. The following year, in 2010, First American obtained the outside interests (including Experian's) in FARES, and it consolidated its interests with First American's other information businesses into Defendant CoreLogic. *Id.*

At various times, individuals who held positions of leadership at Experian occupied official positions at CoreLogic and its predecessors and associated companies. In this regard, Experian Chief Executive Officer Donald A. Robert, who has served in that position since 2005, was previously employed from 1995 to 2001 as the president of Credco. *Id.* at ¶ 23. Similarly, during the events

alleged in the Complaint, which began shortly after the 2005 reorganization, Daniel Hegarty served as an Experian executive with direct responsibility for Experian's relations with CBS, other mortgage CRAs, and other resellers.  *Id.* at ¶ 24.  Before joining Experian, Hegarty was employed by First American as the Vice President of Operations and Director of Mortgage Credit Reporting of First American Credco.  *Id.*

> 2. *The March 22, 2005, Investor Conference Call Presented Jointly by First American and First Advantage*

On March 22, 2005, the president of First Advantage, Anand Nallathambi (now CEO of CoreLogic), and the CEO of First American, Parker Kennedy, appeared on an investor conference call to discuss the reorganization of the companies and plans for the transfer of First American's CIG to First Advantage.  D.E. 1 at ¶ 20.  A transcript of this conference call cited by CBS quotes Nallathambi and Kennedy as making the following remarks during the course of the conference call:

> Nallathambi:  Okay, we do have a very good relationship with Experian and they are a supplier and our partner.  And there are times when we do decide that we need to compete and if there is an opportunity to partner, that would be our first option.  We did partner with them in the (inaudible) Title Insurance venture.  They are 50% owner of that venture with us.  So I would say any opportunity we have, if it is not in their core business where they would compete with us, we would look to partner with them.
>
> * * * * *
>
> Nallathambi:  We do our thing and they do their thing.  We don't necessarily, if we are going after a credit-based company, we just go after them, do the best that we can.  And some we win; some we don't win.  And the way we get together mostly on business ideas and innovative solutions and if it makes sense, then we get together.

Kennedy:        . . . I might add that by contract, we have the exclusive right to acquire mortgage related companies and compete in that arena exclusively.

Analyst:        . . . . I guess now that First Advantage is a different profile than FARES though. And I just think that you would be running into similar acquisitions that you both might want to do, but okay.

Kennedy:        By and large, we don't bump into each other. We do have similar businesses to be sure, but we really haven't had any conflicts.

* * * * *

Analyst:        All right, the minority interest [in First American], is that the $85m you had last year in minority interest, can you break that out between sectors? . . . Is the majority of that other than the First Advantage portion, is the rest of that joint ventures [sic] with Experian?

Kennedy:        Yes it is. Experian fundamentally owns 20% of mortgage information, property information, and credit. That's a little bit of an oversimplification, but that's fundamentally the case. So they own a big part of our Company.

* * * * *

Nallathambi:    . . . [T]alking about securing and integrity of data and privacy and the permissibility of its use is really important, especially in the environment that we are operating in today. An abundance of caution is the absolute necessity. We follow all the compliance regulations that govern us. We are obviously governed by the FCRA. We're regulated by the SEC. The bureau[1] is audited all the time. We're their biggest reseller so that's to the detriment of other smaller resellers. These states noticed that they have started shutting them down because they'd like to

---

[1] The Complaint alleges that "bureau" in this quotation refers to Experian.

> send a message to us because we live up to higher
> standards and they have much better visibility into
> how we take care of compliance . . . .

*Id.* at ¶¶ 20-22, 45.

With respect to the last quotation set forth above, CBS avers that the last sentence was transcribed incorrectly on the official transcript. *See* D.E. 1 at ¶¶ 46-48. According to the Complaint, instead of the last sentence as quoted, Nallathambi said words to the effect that Experian and the repositories — not the states — were shutting down other smaller resellers. *Id.* at ¶¶ 46-47.

### *3. Project Fair Share*

CBS further alleges that in 2006, Experian, Equifax, and TransUnion "virtually simultaneously" introduced new CRA reseller reissue policies, a policy shift that Experian referred to internally as "Project Fair Share." D.E. 1 at ¶ 49. A "reissue" is an authentic copy of a tri-merged credit report previously prepared by a CRA reseller. *Id.* at ¶ 38. Because it is a copy of a report that has already been prepared, the issuing CRA provides the reissued report at a significantly lower cost that a new report from Experian or from another CRA reseller. *Id.* As CBS explains it, a CRA reseller provides a reissued credit report to a lender who requires a copy of a tri-merged report that was used by the mortgage broker that originated the loan. *Id.* Using a reissued report eliminates any discrepancies that might appear between the broker's original report and a lender's subsequent report that would then need to be reconciled. *Id.* In addition, it complies with the GSEs' underwriting guidelines that require a mortgage credit report relied upon by the lender to have been issued directly by the mortgage CRA that created the report. *Id.*

Under Project Fair Share, Experian implemented an across-the-board charge of a percentage of mortgage CRA resellers' average mortgage credit report and score purchases, to capture payment

for reissued reports.  *Id.* at ¶ 42.  CBS characterizes Project Fair Share's changes in policies and procedures as "designed and intended to raise the cost of doing business for resellers, promote and hasten their exit from the market, and further raise the price of credit information used for mortgage underwriting above competitive levels."  *Id.* at ¶ 38.  According to the Complaint, the repositories introduced the Project Fair Share changes under "the pretext of ensuring compliance by their reseller customers with the FCRA."  *Id.*  at ¶ 51.

### 4.  Project Green

Plaintiff next suggests that Project Fair Share did not eliminate First American's competition quickly enough for First American.  D.E. 1 at ¶ 54.  Therefore, Plaintiff contends, First American threatened Experian "with either supporting the relaxation of the tri-merge norm or entering the market as a fourth repository for credit data for conforming, tri-merged mortgage credit reports unless Experian took further action to exclude competing resellers from the market."  *Id.*  If First American successfully undertook either of these actions, the result would alter the status quo, and CRAs would not have to obtain credit reports from Experian because either (1) dual-mergedd or single-repository reports would become acceptable, or (2) tri-merged reports could be prepared using information from Equifax, TransUnion, and a First American repository.  *See id.*

CBS claims that Experian viewed as "credible and significant" First American's alleged threat.  *Id.*  Because of this alleged concern, CBS continues, on about May 16, 2007, Experian's Group Chief Executive Officer for the Consumer Information Solutions ("CIS") Group, Kerry Williams, presented a plan called "Project Green."  *Id.* at ¶ 55.  As CBS characterizes Project Green, the new program would have created a minimum annual purchase requirement of up to $1 million for CRA resellers, imposed new and substantial annual compliance fees, raised wholesale prices for

credit reports sold to resellers, and implemented new and burdensome compliance requirements. *Id.*

Experian's board approved the project following the May 2007 presentation. *Id.* at ¶ 57. On August 19, 2007, Williams distributed an email to five other Experian employees, attaching his recommendation for the next steps to undertake in Project Green. *Id.*; *see also* D.E. 1-5. About six weeks later, on October 2, 2007, Williams sent out a second version of the Project Green memorandum. D.E. 1 at ¶ 57; *see also* D.E. 1-6.

In contrast to CBS's characterization of the purpose of Project Green, both versions of the memorandum express concern that "[m]anaging the reseller channel to the standards of Experian information security practices has become more complex during the last two years as Experian dramatically increased its internal security measures. It is appropriate that Experian develop enhanced programs within the reseller channel to ensure adequate safeguards for our clients' data are in place." D.E. 1-6 at 3.[2] The memoranda further describe "[t]he issues [Experian] [is] most focused on mitigating" as "[t]heft of data[,] [m]isuse of data[,] [r]egulatory scrutiny[,] [l]egal attacks[,] [i]nternal audit flags, [and] [b]usiness reputation issues." *Id.* at 4.

In this regard, the memoranda proposed "to mitigate these risks" by undertaking the following steps:

> 1.  Annual third party IT certifications along with quarterly system scans
>
> 2.  Review of resellers' end-user screening program and

---

[2]Some documents in the record containing more than one page-numbering system: the number or numbers on the documents at the time that they were filed with the Court and the page numbers imprinted by the Court's CM/ECF system across the tops of the pages of the filings. This Order refers to the page number left by the Court's CM/ECF system.

membership files ongoing

3.      Closer tracking of reseller remediation activities

4.      Review of resellers' end-user monitoring programs ongoing

5.      Independent review of our compliance program to assess its effectiveness in risk mitigation

6.      Proactive discussions with regulatory agencies to share the program aspects and endorsements

7.      Compliance program will support the controls included in the internal audit program scope

8.      Reduced populations of resellers to those that can demonstrate their ability to meet program requirements

9.      Increased compliance and technology resources

10.     Proactive educational support

11.     Enhanced anomaly detection monitoring systems

*Id.* at 4-5.

In addition, among the "related" "[a]ncillary [r]evenue [i]mpacts" stemming from Project

Green, both memoranda state as follows:

> Tri-bureau Mortgage Reports — Experian has profitably participated in this industry practice for many years. More recently — and based on industry price increases — large resellers such as First American have threatened to gather enough industry support to approach the secondary market for more relaxed policies concerning tri-bureau mortgages. Any move that encourages additional national repositories to enter the market or dilutes the three repository norm would have significant ramifications to Experian. Our plan is designed to reasonably avoid such changes in the industry.

D.E. 1-6 at 3-4.

The two versions of the memorandum differ from each other only in that the August draft

-10-

contemplated a minimum annual revenue requirement of $100,000 , while the October version set forth a minimum annual revenue requirement of $50,000.  *See* D.E. 1 at ¶ 58; *see also* D.E. 1-5; D.E. 1-6.  As a result, each form of the plan potentially affected different numbers of resellers.

Under the August plan, approximately190 active resellers would have been eliminated from Experian's program because their revenues did not meet the threshold.  D.E. 1 at ¶ 58; D.E. 1-5. Consequently, Experian would have experienced a decline in revenue of $6 million, but, by imposing a compliance-assessment fee of $30,000 on each remaining reseller, Experian would have recovered $4.2 million of this amount.  D.E. 1 at ¶ 58; D.E. 1-5 at 5.  Factoring in all revenues and costs arising out of the August plan, the impact to Experian's earnings before income and taxes, commonly known as "EBIT," was estimated to have been a decrease of $9,884,000.  D.E. 1 at ¶ 58; D.E. 1-5 at 6.

For its part, the October plan reduced the resellers excluded to 136, leaving 196 remaining. D.E. 1 at ¶ 58; D.E. 1-6.  As a result, the anticipated annual revenue decline decreased to $2.3 million, and the expected increase in income from the $30,000-per-reseller compliance fee rose to $5.9 million.  D.E. ¶ 58; D.E. 1-6.  Accounting for all revenues and costs contemplated by the October version, Experian expected a $3,192,000 decrease to its EBIT as a result of the October draft of Project Green.  *See* D.E. 1 at ¶58; D.E. 1-6 at 6.

Experian further revised Project Green on about January 30, 2008, when it informed its CRA resellers of a new minimum purchase requirement of $60,000 per year, imposed as a $5,000-per-month minimum charge.  D.E. 1 at ¶ 61.  CBS avers that this higher minimum requirement resulted in the termination of approximately 160 of Experian's reseller customers.  *Id.*  Based on its review of Project Green, CBS opines that Experian enacted the plan because it believed that "effectively

terminating 160 resellers *en masse* would satisfy First American/CoreLogic and neutralize its threat, thereby perpetuating and maintaining the tri-merged norm and Experian's monopoly market power in mortgage consumer information." D.E. 1 at ¶ 60.  According to the Complaint, contrary to the stated rationalization for Project Green, "Experian's policies are neither motivated by nor reasonably necessary to ensure the security of Experian's consumer credit information.  Equifax and TransUnion do not have comparable policies and their consumer credit data is as secure as Experian's." *Id.* at ¶ 62.

### 5.  The Demise of CBS's Mortgage-credit-reporting Business

CBS was a mortgage CRA reseller until March 2011.  D.E. 1 at ¶ 71.  At that time, it closed its mortgage-credit-reporting business because, according to CBS, it lacked access on commercially reasonably terms to Experian consumer credit information for use in preparing tri-merged reports. *Id.*  CBS further contends that other similarly situated mortgage CRAs were likewise injured in their business or property as a result of the implementation of Project Green. *Id.* at ¶ 72.  Despite closing its mortgage-credit-reporting business, CBS continues to operate its non-mortgage-credit-reporting business.  D.E. 37 at ¶ 5.  The business remains operational at its Oakland Park location and has four employees. *Id.* at ¶ 6.

### 6. Credit Bureau Services, Inc. [(NE)] v. Experian Information Services, Inc., *District Court for Dodge County, Neb. (No. CI-08-740)*

Apparently in relation to the impact of Project Green on CBS, CBS sued Experian in state court in Nebraska in a case styled *Credit Bureau Services, Inc. [(NE)] v. Experian Information Services, Inc.*, District Court for Dodge County, Nebraska (No. CI-08-740) "(Nebraska Case").  *See* D.E. 1 at ¶ 75.  During the trial in the Nebraska Case, the August and October Project Green

memoranda and other tangible evidence relating to Project Green were introduced on about December 15, 2011.  *Id.*  CBS asserts that upon reviewing these materials, it discovered that Experian's alleged true intent in proceeding with Project Green was to separate scores of resellers from the reseller channel," apparently to appease CoreLogic and cause CoreLogic not to proceed with plans to disrupt the three-depository status quo.  *Id.*  Prior to that time, CBS claims, it was under the impression, allegedly fostered by Experian, that Experian implemented Project Green because of data-security and FCRA compliance concerns.  *Id.* at ¶ 73.

C.  The Litigation

   *1.  The Complaint*

   Based on the events discussed above, CBS, on behalf of itself and purportedly on behalf of all other similarly situated mortgage CRAs, filed the pending lawsuit against Experian and CoreLogic.  *See* D.E. 1.  The Complaint contains four counts.

   Count I, asserted against both Experian and CoreLogic, alleges that both Defendants conspired to restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  *See id.* at Count I.  According to the Complaint, Experian and CoreLogic agreed that CoreLogic "would continue to support the tri-merged norm and refrain from entering as, or support the entry of, a fourth repository into the wholesale market for consumer mortgage credit information in exchange for Experian's implementation of Project Green . . . ."  *Id.* at ¶ 86.

   CBS posits that this alleged agreement unreasonably restrains trade in two ways:  first, it "unreasonably . . . foreclose[s] 85 [mortgage] CRAs from the retail mortgage credit reporting market and . . . raise[s] costs on the remaining [mortgage] CRAs, all of which are rivals of Credco, Experian's mortgage credit reporting portfolio interest"; second, it "calls for CoreLogic to refrain

from competing or promoting competition in the market." *Id.* at ¶ 89.  As CBS describes the effects of this alleged agreement, the alleged conspiracy "impos[es] inhospitable, high-cost conditions in the CRA reseller business, increased costs for CoreLogic's rival CRA resellers, heightened barriers to entry into CRA reseller businesses, the separation of approximately 160 CRAs from Experian's reseller channel, the departure of 85 [mortgage] CRAs from the retail credit reporting market, and the maintenance of Experian's monopoly in [the] wholesale market for mortgage credit information." *Id.* at ¶ 90.

Count II charges Experian and CoreLogic with conspiring to perpetuate and maintain the tri-merged norm, "and thus Experian's monopoly," in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  *Id.* at ¶ 95.

Count III, asserted against Experian only, alleges a substantive violation of Section 2 of the Sherman Act.  *See id.* at Count III.  More specifically, Count III claims that Experian "willfully maintained its monopoly power in the wholesale market for mortgage credit information through anticompetitive acts other than competition on the merits." *Id.* at ¶ 100.  In this regard, the Complaint continues, Experian acted to deny CBS and the putative class members reasonable access to Experian consumer credit information in order to maintain Experian's monopoly in the relevant wholesale market.  *Id.* at ¶ 103.

Finally, Count IV sets forth a separate substantive claim against Defendant Experian only, also under Section 2 of the Sherman Act — this time for unilateral refusal to deal.  *See id.* at Count IV.  This count asserts that Experian "controls access to Experian consumer mortgage credit information, which is a service or good essential to effective competition in the retail mortgage credit reporting market." D.E. 1 at ¶ 106.  It further avers that Experian denied CBS and the putative class

members access to Experian's consumer credit information on commercially reasonable terms. *Id.* at ¶ 109. As CBS describes it, "[d]enying [CBS] . . . access to Experian's consumer credit information was contrary to Experian's independent business interests, led to the sacrifice of short-run earnings and profits, and made sense only because of its harm to competition, because it helped FARES gain market share in the relevant retail market and helped Experian maintain monopoly power in the relevant wholesale market." *Id.* Finally, CBS concludes, "Experian's refusal to deal was implemented for the purpose of blocking the entry of competitors and potential competitors and to maintain monopoly power and not for a legitimate business purpose in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2." *Id.* at ¶ 110.

### 2. The Motion to Dismiss

In response to the Complaint, Defendants Experian and CoreLogic filed their Joint Motion to Dismiss Complaint With Prejudice [D.E. 20] ("Motion to Dismiss"). In the Motion to Dismiss, Defendants first contend that Counts III and IV of the Complaint should be dismissed for failure to plead any exclusionary conduct that maintained a monopoly. *See id.* at 8-14. They further argue that the Court should dismiss the conspiracy counts for failure to plead sufficient facts to make the existence of a conspiracy plausible. *See id.* at 14-16. In addition, Defendants assert that all of CBS's claims are barred by the statute of limitations. *Id.* at 17-20. CBS opposes Defendants' Motion to Dismiss. *See* D.E. 28.

### 3. The Motion to Transfer Venue

Three weeks after Defendants filed their Motion to Dismiss, they filed their Joint Motion to Transfer Venue to the Central District of California, Southern Division [D.E. 29] ("Motion to Transfer Venue"). In this motion, Defendants urge the Court to transfer this case to the United States

District Court for the Central District of California, Southern Division, "because there is no connection between the alleged events and the Southern District of Florida." *Id.* at 2. CBS also opposes this motion.

In support of their Motion to Transfer Venue, Defendants filed the Declarations of Daniel Hearty and Anand Nallathambi. *See* D.E. 29-1; D.E. 29-2. Hegarty, who serves as Experian's Director of Business Development, Specialized Sales, resides and works in Texas. D.E. 29-1 at ¶¶ 1, 4. According to Hegarty, Experian's principal place of business and its corporate headquarters are located in Orange County, California. *Id.* at ¶ 6. In addition, Hegarty attests that of the other thirteen Experian and former Experian employees who received a version of the Project Green memorandum, seven currently reside in Orange County, although one — Kerry Williams — is in the process of relocating to Great Britain. *Id.* at ¶ 9. Of the remaining six, one works in Maryland, two live in Texas, one resides in New York, and Hegarty does not know where the other two live. *Id.* Nonetheless, Hegarty further states that, to his knowledge, none have ever worked for Experian in the Southern District of Florida. *Id.* With respect to documents and records relating to Project Green, Hegarty indicates that "[m]any" of them "would be located at Experian's corporate headquarters in Orange County, California." *Id.* at ¶ 10. Finally, Hegarty reports that CBS advised Hegarty's department in approximately February 2011 that it had merged its credit-reporting business into Credit Advantage, an Experian reseller located in Colorado. *Id.* at ¶ 8.

For his part, Nallathambi, who lives in Orange County, is currently employed as the Chief Executive Officer for CoreLogic, Inc., which also has its corporate headquarters and principal place of business in Orange County. D.E. 29-2 at ¶ 1. He attests that "any strategic consideration or decisions relating to First American's position regarding support of the tri-merged norm or of

entering the wholesale market as a fourth repository" during the relevant timeframe would have required the involvement of himself and three other named individuals, all of whom currently work in Orange County and none of whom live or work in Florida. *Id.* at ¶¶ 12-17. Nallathambi continues, specifically denying that any CoreLogic personnel "who are responsible — or were responsible during the timeframe relevant to the Complaint — for evaluating or deciding major strategic matters such as CoreLogic's position regarding the tri-merged norm or any consideration of potential entry as a fourth repository work in Florida." *Id.* at ¶ 19. In addition, Nallathambi avers that the "vast majority of strategic documents and records concerning CoreLogic's high-level corporate decision-making are located in Orange County . . . ." *Id.* at ¶ 18.

Soon after filing their Motion to Transfer Venue, Defendants filed their Joint Motion for the Court to Consider Defendants' Joint Motion to Transfer Prior to the Joint Motion to Dismiss [D.E. 30]. The Court set oral argument for November 16, 2012, on the Motion to Dismiss and the Motion to Transfer Venue. *See* D.E. 34. On November 16, 2012, the Court held oral argument on Defendants' pending motions.

Following the November 16 hearing, CBS filed the Declaration of Steven P. Naimoli, the owner of CBS. *See* D.E. 37. Among other assertions, the Naimoli Declaration explains that CBS ceased mortgage credit report reselling, and it negotiated an arrangement with Advantage Credit, a Colorado-based mortgage credit reporting reseller, under which CBS would receive a commission for referring mortgage credit reporting clients to Advantage Credit. *Id.* at ¶ 4. According to Naimoli, this arrangement lasted from March 2011 until about May 13, 2012. *Id.* Now, however, 100% of CBS's clients are non-mortgage-credit-reporting clients. *Id.* at ¶ 5. Finally, the Naimoli Declaration states that Naimoli, along with the three other Oakland Park-based employees of CBS are "likely to

be witnesses at trial," although Naimoli does not explain why.  *See id.* at ¶ 6.

## *II.  Discussion*

### A.  Motion to Consider Motion to Transfer Venue First

Defendants urge the Court to consider the Motion to Transfer Venue before the Motion to Dismiss.  *See* D.E. 30.  They suggest that doing so might obviate the need for the Court to decide the Motion to Dismiss.  During oral argument, however, Defendants acknowledged that if the Court were to transfer this case to the Central District of California, as requested, the fully briefed Motion to Dismiss would remain pending, and the new judge assigned would have to address it.  Although this Court has complete confidence in the ability of other federal courts to fully address the merits of this case, unless a specific reason exists as to why the receiving court would be better prepared to handle a pending motion than the transferring court, transferring a case with a ripe motion delays proceedings and does not comport with the spirit of Rule 1, Fed. R. Civ. P., "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Nor have Defendants offered any reason why this Court is not capable of engaging in the appropriate analysis.  Thus, because Defendants chose to file the Motion to Dismiss first, and further, because it is fully briefed at this time that the Court also considers the Motion to Transfer Venue, this Court will address both motions.

### B.  The Motion to Dismiss

#### *1.  The Standard on a Motion to Dismiss*

Rule 12(b)(6), Fed. R. Civ. P., governs motions to dismiss for failure to state a claim.  It provides, in relevant part,

> **(b)**      **How to Present Defenses.**  Every defense to a claim for relief

-18-

> in any pleading must be asserted in the responsive pleading if
> one is required.  But a party may assert the following defenses
> by motion:
>
> **(6)**    failure to state a claim upon which relief can be
> granted; . . . .

*Id.*  Thus, the Court considers the Federal Rules of Civil Procedure as they set forth the requirements for stating a claim.

Rule 8(a)(2), Fed. R. Civ. P., demands that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint need not provide detailed factual allegations, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Similarly, "naked assertion[s] bereft of "further factual enhancement" do not suffice.  *Twombly*, 550 U.S. at 555, 557.  As the Supreme Court has explained, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  at 555.  "Moreover, the facts supporting the claim must be 'consistent with the allegations in the complaint.'"  *Wilchombe*, 555 F.3d at 958 (quoting *Twombly*, 550 U.S. at 562).

When reviewing a motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true.  *Bell v. J.B. Hunt Transp., Inc.*, 427 F. App'x 705, 707 (11th Cir. 2011) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 72 (1984)).  The Court must also draw all reasonable inferences in the plaintiff's favor.  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1194 (11th Cir. 2007).  But "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Bell*, 427 F. App'x at 707 (quoting *Jackson v. BellSouth Telecomm'ns*, 372 F.3d 1250, 1263 (11th Cir. 2004) (internal quotation marks omitted)); *see also*

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-51 (2009).  Thus, the allegations in a complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).  Finally, although the Supreme Court has indicated the applicability of this pleading standard to all types of cases, *see Iqbal*, 556 U.S. 662, courts have recognized the particular importance of "insist[ing] on some specificity in pleading" in the context of antitrust cases.  *See, e.g., CBC Cos., Inc. v. Equifax, LLC*, 561 F.3d 569, 571 (6th Cir. 2009) (quoting *Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 731-32 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 558)) (internal quotation marks omitted).

## *2.  The Merits of Defendants' Motion to Dismiss*

Defendants urge dismissal of the Complaint on several bases.  First, Defendants attack the entire Complaint as barred by the statute of limitations.  Second, with respect to the Sherman Act Section 1 conspiracy alleged in Count I and the Sherman Act Section II conspiracy set forth in Count II, Defendants submit that CBS has failed to satisfy the pleading standards announced in *Twombly* and *Iqbal*.  Finally, Defendants contend that Counts III and IV do not assert facts that would demonstrate each of the elements necessary to state a cause of action under Section 2 of the Sherman Act.

## a.  The Statute of Limitations

Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes a private cause of action for a violation of the Sherman Act, provided that such an action is brought within "four years after the cause of action accrued."  *See* 15 U.S.C. §§ 15, 15b; *see also Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827-28 (11th Cir. 1999).  A cause of action accrues, in turn, "when a

defendant commits an act that injures the plaintiffs' business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

Here, the latest event cited by CBS in the Complaint occurred on approximately January 30, 2008, when Experian advised all of its CRA resellers, including CBS, of the new minimum purchase requirement of $60,000 per year, imposed as a $5,000-per-month minimum charge, and other features of Project Green. *See* D.E. 1 at ¶61. Because CBS did not file the pending suit until more than four years later — on July 10, 2012 — Defendants urge, the statute of limitations precludes all of CBS's claims.

CBS relies on the theory of fraudulent concealment to save its otherwise-untimely Complaint.[3] When fraudulent concealment of antitrust-law violations occurs, it tolls the statute of limitations. *Morton's Market*, 198 F.3d at 832. For this doctrine to apply, however, the plaintiff must demonstrate that "the defendants concealed the conduct complained of, and that [plaintiffs] failed, despite the exercise of due diligence on [their] part, to discover the facts that form the basis of [their] claim." *Id.* (quoting *In re Beef Indust. Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir. 1979)) (additions made by *Morton's Market* Court) (internal quotation marks omitted).

To satisfy the due-diligence requirement, a plaintiff must demonstrate that once it either knew of its claim or had "notice sufficient to prompt [it] to investigate," it pursued the claim diligently.

---

[3]CBS also refers in its brief to the doctrine of "continuing antitrust violation." *See* D.E. 28 at 19-20. Under this theory, "[a]n act constitutes a 'continuing violation,' if it injures the plaintiff over a period of time. Even though the illegal act occurs at a specific point in time, if it inflicts 'continuing and accumulating harm' on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act." *Morton's Market*, 211 F.3d at 828 (quoting *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968); *see also Zenith*, 401 U.S. at 338. Although CBS mentions the "continuing antitrust violation" theory in its brief, it does not propose application of the theory to the facts in this case. *See* D.E. 28 at 19-21. Nor does CBS assert the theory in its Complaint. Therefore, the Court does not address the doctrine here.

*See id.* (citing *In re Beef Indust. Antitrust Litig.*, 600 F.2d at 1170).  The Eleventh Circuit has held

that when a plaintiff is on "notice" of its claim constitutes a question of fact.  *Id.* (citing *Ballew v.*

*A.H. Robins Co.*, 688 F.2d 1325 (11th Cir. 1982)).

      Here, CBS asserts that the statute of limitations was tolled until approximately December 15,

2011, when, during the course of the trial in the Nebraska Case between CBS and Experian, the

Project Green memoranda and accompanying documentation were introduced.  *See* D.E. 1 at ¶ 75.

Although CBS was aware as of January 2008 of Experian's policy imposing a minimum monthly

charge on resellers, CBS avers, Experian publicly explained the price increases at that time as being

necessitated by data-security requirements.  D.E. 1 at ¶ 73.  It was not until CBS had the opportunity

to obtain the Project Green memoranda and accompanying documentation that CBS discovered what

it contends was the true purpose of Project Green:  to appease CoreLogic so that it would refrain

from entering the wholesale market as a fourth repository or from lobbying for a change to the tri-

merged norm.  *See id.*  Put simply, CBS alleges that Experian's publicly stated reason for Project

Green — data security — was a pretext or a subterfuge to conceal Defendants' alleged antitrust-law

violations.

      Without determining the sufficiency of the factual allegations that Defendants agreed to put

Project Green into place as a *quid pro quo* for CoreLogic's forbearance from interfering with the

three-repository norm (that is addressed *infra*, *see* Sections II.B.2.b and II.B.2.c), the Court concludes

that, if true, CBS's fraudulent-concealment allegations satisfy the requirements necessary to toll the

statute of limitations until December 15, 2011.  First, taking CBS's contentions as true for purposes

of this analysis only, Experian and CoreLogic affirmatively concealed their arrangement by agreeing

that Experian would package it as Project Green, a unilateral initiative for improving the data

security of Experian's product.

Second, in view of Experian's public explanation of Project Green, CBS could not have learned of Experian's true purpose in adopting Project Green without either Experian's internal documentation or an admission by an agent of Defendants.  Since Defendants controlled all access to such sources, CBS could not have discovered the illicit purpose of Project Green until Defendants chose or were required to reveal incriminating evidence.  That did not occur until about December 15, 2011, during trial in the Nebraska Case.

Nor, as Defendants suggest, did the fact that Experian had allegedly been charging high prices "for years" necessarily render suspect the data-security explanation for Project Green and provide reason for CBS to know that Project Green was a pretext for illegal conduct.  To the contrary, under CBS's theory of the case, Defendants created the data-security explanation for the very purpose of falsely explaining the high prices.  Defendants reliance on the litigation in *Standfacts Credit Servs. v. Experian Info. Solutions, Inc.*, Case No. SACV 04-0358-DOC (PJWx) (C.D. Cal.), is similarly unavailing to demonstrate CBS's lack of diligence.  The *Standfacts* litigation occurred began in 2004, while Project Green was not initiated until 2008.

This case was filed approximately seven months after CBS learned of the Project Green memoranda and accompanying documentation, well within the four-year period that began to run on December 15, 2011.  Accordingly, to the extent that the factual allegations supporting CBS's theory of fraudulent concealment are sufficiently pled, this case is not barred by the statute of limitations.

b.  The Sufficiency of the Conspiracy Counts (Counts I and II)

Defendants also urge dismissal of Counts I and II on the basis that they fail the pleading

standard established by the Supreme Court in *Twombly*.   *Twombly* involved the circumstances resulting from the restructuring of the telephone-service industry.   Under the Telecommunications Act of 1996, regional telephone-service operating companies, known as incumbent local exchange carriers ("ILECs"), were required to share their network with competitors, known as competitive local exchange carriers ("CLECs").   550 U.S. at 549.   A plaintiff class of CLECs alleged that the ILECs conspired to restrain trade, in violation of Section 1 of the Sherman Act, by inflating charges for local telephone and high-speed Internet services.   *Id.* at 550.

In support of this claim, the CLECs pled that the ILECs had "engaged in parallel conduct," meaning that each ILEC conducted the same types of actions in its respective service area, which discouraged the growth of the CLECs.   *Id.*   More specifically, the CLECs complained that the ILECs all made unfair agreements with the CLECs for access to ILEC networks, provided inferior connections to the networks, overcharged, and billed using methods designed to sabotage the CLECs' relationships with their clients.   *Id.*

Based on these allegations, the CLECs averred that the ILECs' "'compelling common motivatio[n]' to thwart the CLECs' competitive efforts naturally led them to form a conspiracy" and that "'[h]ad any one [ILEC] not sought to prevent CLECs . . . from competing effectively . . . , the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct."   *Id.* at 550-51 (modifications made by *Twombly* Court).

The complaint further supported its contention that the ILECs had agreed to refrain from competing against one another by asserting that the ILECs had failed "'meaningfully [to] pursu[e]' 'attractive business opportunit[ies] in contiguous markets where they possessed 'substantial

-24-

competitive advantages,'" and relying on the averment that the chief executive officer of one of the ILECs had commented that competing in the territory of another ILEC "might be a good way to turn a quick dollar but that doesn't make it right[.]" *Id.* at 551 (modifications made by *Twombly* Court). Ultimately, the CLECs concluded, "Upon information and belief[,] . . . [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.* (internal quotation marks omitted).

The Supreme Court held that the CLECs' allegations could not survive a motion to dismiss. At the heart of this determination was the Court's plausibility analysis. Under this standard, "mere possibility" that a violation may have occurred does not suffice; a complaint must set forth sufficient factual matter to render plausible the legal causes of action that it alleges. *See id.* at 556-57. Thus, the CLECs' naked allegation of an agreement among the ILECs, supported by contentions of fact demonstrating, at most, the ILECs' parallel conduct, could not sustain claims of antitrust conspiracy in violation of Section 1 of the Sherman Act. *See, generally, id.* Although parallel activity might be consistent with an illegal antitrust agreement, the Court explained, it could "just as well be independent action." *Id.* at 557. Indeed, the Court opined, the ILECs had natural reasons independently to act in ways similar to each other. *See id.* at 566-69. "[W]ithout that further circumstance pointing toward a meeting of the minds [among the defendants], an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 557. In other words, the Court held that the complaint did not allege sufficient facts making it plausible that an agreement among the ILECs, in violation of the Sherman Act — as opposed to independent parallel conduct — had occurred, and therefore, the Court concluded that the complaint had been properly dismissed.

Analogizing this matter to *Twombly*, Defendants insist that the Sherman Act conspiracies set forth in CBS's Complaint can fare no better than the Section 1 conspiracies alleged in the *Twombly* complaint.  This is so, Defendants contend, because, like the CLECs in *Twombly*, (1) nowhere does Plaintiff here "allege the who, when, and where of the alleged conspiracy," D.E. 20 at 14; (2) Plaintiff's allegations of an agreement between Defendants is entirely conclusory and speculative, *id.* at 15; and (3) the "[a]llegations of facts . . . [in the Complaint] could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy . . . ," *id.* at 16 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)) (internal quotation marks omitted).

CBS retorts, arguing that the following purported allegations in the Complaint sufficiently combine to allege plausible agreements in violation of Sections 1 and 2 of the Sherman Act:

(i)      A course of dealing wherein Experian and CoreLogic cooperated over a period of many years, including co-ownership through a joint venture of the nation's largest consumer credit reporting reseller, CoreLogic Credco. *Compl.* at ¶¶ 20-22;

(ii)     The written statement by Experian's Group CEO in the Project Green memoranda identifying threats by "large resellers such as First American" (now, CoreLogic) "to gather enough industry support to approach the secondary market for more relaxed polic[i]es concerning tri-bureau mortgages," *Compl.* at ¶¶ 59, 62;

(iii)    Experian's development and implementation of a plan "designed to reasonably avoid such changes in the industry," *Id.*;

(iv)     Experian's sacrifice of short run profits (*Compl.* at ¶ 58) and self-imposed limitation of future growth in the reseller channel, *Compl. Exs. C and D* at 4 ("This [Project Green] will naturally reduce the number of future opportunities for this

-26-

channel");

(v)   Forward-looking statements [on March 22, 2005,] by [CoreLogic's] CEO anticipating Experian's efforts to eliminate "smaller resellers," *Compl.* at ¶¶45-48; and,

(vi)  The earlier affiliation of the CEO of Experian plc and its executive responsible for resellers as, respectively, President and Vice-President of Operations and Director of Mortgage Credit Reporting at CoreLogic Credco, *Compl.*, at ¶[¶] 23-24.

D.E. 28 at 15-16.  Pointing to these factors, CBS invokes the Eleventh Circuit's statement that "it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators," D.E. 28 at 17 (quoting *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("*Delta*") (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573-74 (11th Cir. 1991)) (internal quotation marks omitted)), and suggests that this is precisely the type of case where conspiracy is properly inferred from Defendants' conduct.  *Id.*

In support of this position, CBS relies on *Delta*.  In *Delta*, the Northern District of Georgia considered whether the plaintiffs, air travelers who paid a first-bag fee on Delta or AirTran flights, had sufficiently pled a Sherman Act conspiracy.  The *Delta* plaintiffs alleged that Delta and AirTran had reached an agreement to both charge a first-bag fee of $15, when, previously, the two airlines had been aggressively competitive with each other in the Atlanta market.

According to the complaint, during a conference call that AirTran monitored, Delta indicated that it had no plans to implement a first-bag fee.  Shortly thereafter, when AirTran held a conference call that it was aware that Delta monitored, AirTran stated that it was considering the viability of implementing first-bag fees.  About two-and-a-half months later, in another conference call to which

-27-

Delta knew AirTran was listening, Delta related that it was then willing to increase ancillary fees, suggesting that it would consider imposing first-bag fees.  Eight days after that, on October 23, 2008, AirTran remarked in its public conference call that it wanted to implement a first-bag fee and had invested in the capability to do so quickly but had not yet imposed the fee because Delta had not done so.  AirTran quickly added that it would implement the fee if Delta did as well.  Less than two weeks later, Delta announced that it would begin charging passengers a $15 first-bag fee, effective December 5, 2008.  AirTran soon likewise stated that it would impose a $15 first-bag fee, also effective December 5, 2008.[4]

The *Delta* Court concluded that these allegations were sufficiently specific to state a claim for Sherman Act conspiracy in that they alleged that an agreement had occurred in violation of the Sherman Act.  In explaining its determination, the *Delta* Court found it "reasonable to infer (at least at the motion to dismiss stage) that Delta's statements . . . were directed to AirTran, particularly when the statements follow or were followed by AirTran's own actions and statements.  The same holds true for the statements made by AirTran . . . , which the Court can plausibly infer were directed at Delta."  733 F. Supp. 2d at 1359.  The *Delta* Court further elaborated that collusive communications in violation of the Sherman Act "can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways."  *Id.* (citations omitted).

The pending case differs materially from *Delta*.  In *Delta*, the plaintiffs alleged facts demonstrating the existence of an agreement — that is, "[a] mutual understanding between two or

_____

[4]The Complaint also involved similar allegations concerning both airlines' decisions to cut capacity, which the court held also sufficiently supported the Sherman Act conspiracy claim.

more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons . . . ." *Black's Law Dictionary* 79 (9th ed. 2009).  First, in the face of Delta's voicing of its opposition to a first-bag fee, AirTran indicated its willingness to Delta to impose a first-bag fee of $15 if Delta did so.  Delta then changed its position, announcing that it would charge such a fee.  True to its word, AirTran similarly stated its intention to charge precisely the same fee as Delta, beginning on the very same day as Delta.  These allegations demonstrate the type of mutual understanding that an agreement anticipates.

Here, on the other hand, even looking at the allegations in the light most favorable to CBS and assuming that CoreLogic's predecessor First American[5] "threatened to gather enough industry support to approach the secondary market for more relaxed policies concerning tri-bureau mortgages,"[6] D.E. 1-6 at 3-4, the Complaint lacks any averments demonstrating the mutuality of Experian's alleged response to First American's threat.  Rather, at most, the Complaint asserts that, when faced with discontent from First American, Experian, on its own, responded in a way that it hoped would appease First American, one of its largest customers.  Unlike in *Delta*, where both AirTran and Delta each indicated what the agreed-upon position was before either party engaged in the agreed-upon activity, here, no allegations in the Complaint point towards the conclusion that First American suggested to Experian what Experian needed to do in order to convince First American to refrain from lobbying the GSEs to change the tri-merged norm.  Nor does the Complaint assert that First American indicated its assent to abstain from trying to alter the tri-merged *status quo* if

---

[5]The statement from the Project Green memoranda actually reads, "large resellers *such as* First American."  D.E. 1-6 at 4 (emphasis added).

[6]The Complaint does not shed any light on how or where the alleged threat was made — whether at an industry conference, in an industry publication, directly to Experian, or otherwise.

Experian imposed a minimum fee on resellers. Instead, we are left with what appears to be, at best, only a unilateral attempt by Experian to respond to dissension among its larger customers.

And this construction of the Project Green memoranda is extremely generous towards CBS. Considering *Twombly*'s concern that the allegations in a complaint fail to state a cause of action where they could just as likely describe legal conduct, the Complaint here also suffers from another plausibility problem. Whereas CBS contends that Project Green was intended to prevent First American from pursuing a change to the tri-merged norm, the allegations concerning the memoranda themselves, as well as those regarding the context in which Project Green was developed, actually suggest more plausibly that the purpose of the plan was instead to improve security for consumer information. Although the Court does not weigh the allegations when considering a motion to dismiss, under *Twombly* and *Iqbal*, a plaintiff must nonetheless plead factual allegations that make its cause of action plausible. Here, for the reasons explained below, the Complaint's allegations no more plausibly suggest that Experian conducted Project Green for the purpose of buying off CoreLogic from interfering with the three-repository and tri-merged report norm than that it adopted the project to increase security for consumer data.

More specifically, while CBS directs the Court to the March 2005 investor call presented jointly by First American and First Advantage to argue that "Experian and the [other repositories] were shutting other smaller resellers down," D.E. 1 at ¶ 46, review of the quotation from the conference call reveals that Mr. Nallathambi was actually emphasizing the importance of data security to the repositories in explaining why smaller resellers were being closed:

> . . . [T]alking about *securing and integrity of data and privacy and the permissibility of its use is really important*, especially in the environment that we are operating in today. *An abundance of caution*

> *is the absolute necessity. We follow all the compliance regulations that govern us. We are obviously governed by the FCRA. We're regulated by the SEC. The bureau[7] is audited all the time. We're their biggest reseller so that's to the detriment of other smaller resellers. These states noticed that they have started shutting them down because they'd like to send a message to us because we live up to higher standards and they have much better visibility into how we take care of compliance . . . .*

D.E. 1 at ¶ 45 (emphasis added). Moreover, CBS concedes that Experian characterized Project Fair Share, which was initiated in 2006, as being introduced to ensure compliance by reseller customers with the FCRA. *Id.* at ¶ 51. Similarly, the Project Green memoranda that followed Project Fair Share also stated the intention of the program as being "to ensure adequate safeguards for our clients' data . . . ." D.E. 1-6 at 3.

        While CBS contends that Experian's stated security concerns are a pretext for its real plan to drive CBS and other small resellers out of business, its allegations comprising its reasoning are again conclusory. First, CBS asserts that the relevant provisions of the FCRA have not been changed since the 1990s, suggesting that federal law did not require Experian to enact its policy changes. D.E. 1 at ¶ 51.

        But the problem with that argument arises from the fact that it ignores the technological explosion that has occurred since the 1990s and the very real privacy and security problems associated with maintaining consumer data, resulting from that increase in technological capability and accessibility. Indeed, the Project Green memoranda mentioned regulatory scrutiny as only one of six areas of concern: "[t]heft of data[,] [m]isuse of data[,] [r]egulatory scrutiny[,] [l]egal attacks[,] [i]nternal audit flags, [and] [b]usiness reputation issues." D.E. 1-6 at 4. In consideration of these

---

[7]The Complaint alleges that "bureau" in this quotation refers to Experian.

issues, it is at least equally plausible that Experian was willing to tolerate the additional costs associated with Project Green to avoid incurring even greater expense dealing with lawsuits, additional regulations, harm to goodwill, and additional regulatory scrutiny that could result from improper safeguarding and handling of private consumer information.

Second, CBS contends that the repositories' failure to apply higher fees outside the mortgage CRA reseller market betrays Experian's alleged true purpose in increasing fees — to run smaller mortgage CRA resellers out of business.  *See id.*  That supposition, however, conveniently ignores the differences in the tri-merged and single-report markets.  As CBS notes, Experian effectively enjoys monopoly power in the tri-merged market, but that is not the case in the single-report market. As a result, it makes business sense that Experian (as well as the other repositories) can and do treat the two markets differently and attempt to cover security costs for both markets by imposing such costs primarily — or even solely — on the tri-merged market.  Tri-merged resellers have nowhere else to go to obtain the information necessary to prepare a tri-merged report, but single-market resellers have two other choices: Equifax and TransUnion.  Therefore, the fact that Experian chose to require its tri-merged market report reseller customers to bear the security costs for both markets of customers does not render the theory that Experian imposed higher fees on its mortgage CRA resellers to appease CoreLogic any more plausible than the idea that Experian did so because it wished to cover its costs and make profits while minimizing the chance of losing business.

Nor, as CBS posits, does Experian's prior ownership interest in or cooperation with CoreLogic,[8] or the fact that officers of each corporation were at other times officers of the other

---

[8]For ease of reading, the remaining references to CoreLogic in this Order refer to CoreLogic, its predecessors, its subsidiaries, its partnerships, or any combination of these, unless otherwise specified.  The term "CoreLogic" does not include references to Experian.

corporation, affect the analysis. "[A] 'mere showing of close relations or frequent meetings between the alleged conspirators [] will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.'" *Credit Chequers Info. Servs. v. CBA, Inc.*, 1999 WL 253600, *9 (S.D.N.Y. Apr. 29, 1999) (quoting *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980), *cert. denied*, 454 U.S. 1083 (1981)).

Moreover, at most, Experian owned a 20% interest in CoreLogic, and the Complaint is devoid of any allegation that Experian ever owned a controlling or governing interest in CoreLogic's predecessors.  To the contrary, the Complaint's allegations concerning the March 22, 2005, conference call put on by CoreLogic note that officers of First American and First Advantage expressly stated that they competed at times with Experian.  Indeed, the Eleventh Circuit has recognized that the reality that "one company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiary's rivals.  To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Comm'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1088 (D.C. Cir. 1998) (internal quotation marks omitted)).

Where, as here, allegations indicating actual agreement between one company and another in which it holds a minority interest do not exist, the mere fact of minority ownership is not sufficient, in and of itself, to establish that an agreement occurred.  And, to the extent that CBS means to imply that the officers of Experian and CoreLogic could have had the chance to make an agreement while transacting some business relating to Experian's 20% interest in CoreLogic, a

"mere opportunity to conspire . . . does not, standing alone, permit the inference of conspiracy." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991)).

Finally, it makes little sense to contend that Project Green which occurred in January 2008, was somehow related to the Complaint's allegations of "[f]orward-looking statements [three years earlier] by [CoreLogic's] CEO anticipating Experian's efforts to eliminate "smaller resellers," *Compl.* at ¶¶45-48." D.E. 28 at 16. Between these alleged statements in 2005 and the initiation of Project Green, Project Fair Share occurred. If, as CBS contends, the 2005 statements were evidence of an agreement between CoreLogic and Experian that Experian would raise prices to drive CoreLogic's competitors out of business, three years and Project Fair Share would not have intervened between the two events, or else Experian would have modified prices sufficiently during Project Fair Share to appease CoreLogic's concerns and avert the need to engage in Project Green. In fact, the very fact of Project Green's existence after Project Fair Share heavily suggests that there was no agreement or even understanding between Experian and CoreLogic as of the March 22, 2005, statements.

In short, much like the CLECs in *Twombly*, who alleged activity that could have been equally consistent with competition and conspiracy, CBS here has set forth factual contentions that are at least just as plausibly explained by competition as they are by conspiracy. Accordingly, Counts I and II of the Complaint must be dismissed for failure to state a claim to relief.

c. The Sufficiency of the Substantive Counts (Counts III and IV)

Section 2 of the Sherman Act makes it a violation to "monopolize, or attempt to monopolize, or combine or conspire with any other person . . . , to monopolize any part of the trade or commerce

among the several States . . . ."  15 U.S.C. § 2.

*i.  Count III*

To state a claim for monopoly maintenance in violation of Section 2 of the Sherman Act, a party must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Morris Comm'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293-94 (11th Cir. 2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (internal quotation marks omitted)).

Under the first element, monopoly power is "the power to control prices in or to exclude competition from the relevant market." *Id.* (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).  As for the second element of a Section 2 claim, a party must show "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market."  *Id.* (citing *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001)).  "Exclusionary," in turn, means that a practice "must harm the competitive *process* and thereby harm consumers."  *Id.* (quoting *E.I. du Pont de Nemours & Co.*, 351 U.S. at 391) (internal quotation marks omitted) (emphasis in original)).  It is not enough that an activity may harm one or more competitors; instead, the relevant inquiry is whether a company's actions to exclude competitors had a "sufficiently adverse impact on competition . . . ."  *Id.* (citing *E.I. du Pont de Nemours & Co.*, 351 U.S. at 391; *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983)).

Here, Experian takes no issue with the first element.  Rather, Experian argues that CBS's monopoly-maintenance claim must fail on the second element because the relevant market in which

-35-

Experian allegedly enjoys monopoly power — the wholesale report market — is not the market from which CBS is allegedly excluded.  Instead, Experian claims, CBS complains that it has effectively been put out of business in the retail report market.  In response, CBS retorts that "Count III plainly alleges that '[d]efendant, Experian, willfully maintained its monopoly power *in the wholesale market for mortgage credit information* through anticompetitive acts other than competition on the merits.'" D.E. 28 at 8 (citing Compl. [D.E. 1] at ¶ 100) (emphasis added by CBS in D.E. 28).

But even under CBS's analysis, Count III cannot survive Defendants' Motion to Dismiss.  This is so because the Complaint does not sufficiently allege that Experian's imposition of a minimum annual fee has the "effect of preventing or excluding competition" in the wholesale report market.

First, other than conclusorily, *see, e.g.,* D.E. 1 at ¶¶ 68, 96, which does not qualify under *Twombly* and *Iqbal*, *see supra,* the Complaint includes no allegations making plausible the idea that CoreLogic or any other entity was prepared to enter the wholesale report market or was prevented from doing so because of Experian's alleged conduct.  Indeed, the Complaint does not even assert facts that would establish that CoreLogic or anyone else ever desired to enter the wholesale report market.  This omission dooms Count III.  In the absence of even a desiring potential competitor in the wholesale report market, there can be no "existence of *actual* injury to competition in that market."[9]  *See Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1983) (citations

---

[9]Defendants cite several cases addressing what it means to be prepared to enter a relevant market.  *See* D.E. 20 at 18-20.  While the cases cited by Defendants do, indeed, define a "prospective participant in a market" as one who "has taken substantial demonstrable steps to enter an industry and is thwarted in that purpose by antitrust violations," *see, e.g., In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464-65 (9th Cir. 1993) — a definition that would not include CoreLogic under the allegations set forth in the Complaint — these discussions appear in the context of the cited cases' analyses of antitrust standing, not of

omitted) (emphasis added).  Instead, at best, any injury to competition in the wholesale report market is entirely hypothetical.  This is not enough.  *See, e.g., Credit Chequers Info. Servs., Inc. v. CBA, Inc.*, 1999 WL 253600, *10 (S.D.N.Y. Apr. 29, 1999) ("The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market . . . .") (citing *Haug v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (citation omitted)) (emphasis added); *Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C.*, 994 F. Supp. 1078, 1093 (S.D. Iowa 1998) (citing *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1296 (7th Cir. 1993) ; *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 917 F. Supp. 1282, 1301 (N.D. Ill. 1996)); *see also CBC Cos., Inc.*, 561 F.3d at 571-72 ("the key inquiry is whether *competition* . . . suffered as a result of the challenged business practice") (citations omitted) (emphasis in original).

Second, with regard to any impact Experian's alleged actions may have had on CoreLogic's decision whether "to gather enough industry support to approach the secondary market for more relaxed policies concerning tri-bureau mortgages," D.E. 1-6 at 4, that allegation of injury to competition, too, is deficient because of the remoteness of Experian's alleged conduct to Experian's ability to maintain its effective monopoly of the wholesale report market as it pertains to tri-merged reports.  Even assuming, *arguendo*, that Experian convinced CoreLogic not to raise industry support to ask the secondary market to consider dual-merged or single reports, such a step, in and of itself, has no effect on Experian's effective monopoly over the tri-merged report market.  There is no

---

the sufficiency of allegations pertaining to the second element of a Section 2 claim for maintaining a monopoly.  Consequently, the Court does not rely on them in its analysis of whether Defendants' conduct violated the antitrust laws.  *See CBC Cos., Inc.*, 561 F.3d at 571 (noting the distinction between the concepts of antitrust injury and antitrust standing).

allegation in the Complaint setting forth facts suggesting that CoreLogic was capable of successfully spearheading such an effort or that the GSEs, who have absolute control over whether tri-merged reports will continue to be required in mortgage transactions, would be at all responsive to such a push. And, CBS has similarly failed to aver that Experian attempted in any way to convince the GSEs directly to continue the tri-merged report norm. Without such allegations, the Complaint does not demonstrate an actual injury or potential injury to competition in the wholesale report market, which is the relevant market here. *See CBC Cos., Inc.*, 561 F.3d at 573 ("No cognizable antitrust injury exists where the alleged injury is a 'byproduct of the regulatory scheme' or federal law rather than of the defendant's business practices") (quoting *RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 13, 15 (1st Cir. 2001); *Standfacts Credit Servs. v. Experian Info. Solutions, Inc.*, 294 F. App's 271, 272 (9th Cir. 2008)).

## *ii.  Count IV*

Count IV charges unilateral refusal to deal, in violation of Section 2 of the Sherman Act. *See* D.E. 1 at Count IV.   More specifically, CBS contends that "Experian denied [CBS] . . . access to Experian's consumer credit information on commercially reasonable terms . . . because . . . it[] harm[ed] competition [and] because it helped FARES gain market share in the relevant retail market and helped Experian maintain monopoly power in the relevant wholesale market." *Id.* at ¶ 109.

The Court has already addressed the deficiencies in the monopoly-maintenance theory in the discussion above regarding Count III.   As for the other two alleged injuries, they cannot save the Complaint, either.

First, the allegation that Experian's alleged denial of access "harm[ed] competition" is vague and unclear.  To the extent that CBS means that competition was adversely affected in the wholesale

report market, as previously discussed, the Complaint contains no allegations that render this conclusory contention plausible.

Second, the allegation that Experian's alleged denial of access to CBS was for the purpose of helping "FARES gain market share in the relevant retail market" carries significance only if Experian is viewed as a competitor through FARES in the retail market. Under such circumstances, the relevant market, for purposes of antitrust analysis, would become the retail report market because that would be where Experian was attempting to obtain monopoly power through FARES.

But the Complaint alleges nothing more than that until 2010, Experian owned a 20% interest in FARES (after 2010, there is no assertion that Experian owned any of FARES or CoreLogic). As noted earlier, "one company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiary's rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d 1065 at 1075 (citation and internal quotation marks omitted). Here, the Complaint contains no such averments. As a result, the Complaint has not adequately pled that Experian has tried to develop monopoly power the retail market. *See Standfacts Credit Servs.*, Case No. SACV 04-0358 DOC (PJWx) (C.D. Cal. Aug. 18, 2004), at 4 [D.E. 20-1 at 5] ("The plaintiff must show the actual creation or attempted creation of a monopoly in the downstream market"). Accordingly, this Count must also be dismissed.

## C.  The Motion to Transfer Venue

Finally, Defendants seek to transfer venue to the Central District of California. The transfer statute, 28 U.S.C. § 1404(a), provides that "[f]or the convenience of the parties and witnesses, in the

interest of justice, a district court may transfer any civil action to any other district or divisions where it might have been brought." The proponent of a transfer of venue bears the burden of demonstrating entitlement. *In re Ricoh Corp.*, 870 F.2d 570, 573 (11ᵗʰ Cir. 1989).

Courts employ a two-step process to analyze whether a motion for transfer should be granted. *Precision Fitness Equip., Inc. v. Nautilus, Inc.*, 2008 WL 2262052, *1 (S.D. Fla. May 30, 2008) (citing *Thermal Techs., Inc. v. Dade Serv. Corp.*, 282 F. Supp. 2d 1373, 1376 (S.D. Fla. 2003); *Jewelmasters, Inc. v. May Dep't Stores*, 840 F. Supp. 893, 894-95 (S.D. Fla. 1993) (citing *Cont'l Grain Co. v. The Barge FBL-585*, 364 U.S. 19 (1960))). First, the court must assess whether the action could have been brought in the venue to which transfer is sought. *Id.* Second, the court determines whether convenience and the interest of justice "require transfer to the requested forum." *Id.* Courts have broad discretion in determining whether a case should be transferred under this provision. *Motorola Mobility, Inc. v. Microsoft Corp.*, 804 F. Supp. 2d 1271, 1275 (S.D. Fla. 2011); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253-54 (1981) ("District courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of *forum non conveniens*") (citation omitted)).

An action "might have been brought" in any court that has subject matter jurisdiction, where venue is proper and where the defendant is amenable to process issuing out of the transferee court. *Windmere Corp. v. Remington Prods., Inc.*, 617 F. Supp. 8, 10 (S.D. Fla. 1985) (citing 15 C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 3845 (1976)). Here, all parties agree that this case "might have been brought" in either the Southern District of Florida or the Central District of California.

Therefore, the Court focuses its analysis on the second venue-transfer inquiry: convenience

-40-

and interest of justice.  In doing so, the Court takes into consideration the following factors:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Motorola Mobility, Inc.*, 804 F. Supp. 2d at 1275-76 (quoting *Meterlogic, Inc. v. Copier Solutions, Inc.*, 185 F. Supp. 2d 1292, 1299 (S.D. Fla. 2002) and citing *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005)).

Beginning with the eighth listed consideration — the weight accorded a plaintiff's choice of forum, as a general rule, a "plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (citation omitted).  Despite this usual rule, a plaintiff's choice of forum receives less deference where, as here, the case is brought as a class action, and the putative class members are residents of numerous, different states.  *Moghaddam v. Dunkin Donuts, Inc.*, 2002 WL 1940724, *2-3 (S.D. Fla. Aug. 13, 2002) (citing *Gould v. Nat'l Life Ins. Co.*, 990 F. Supp. 1354, 1358 (M.D. Ala. 1998)); *Lou v Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) (citations omitted).  As the Supreme Court has explained, "[W]here there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporation's cause of action and all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened." *Moghaddam*, 2002 WL 190724 at *2-3 (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) and citing *Bolton v.*

*Tesoro Petroleum Corp.*, 549 F. Supp. 1312, 1313-14 (E.D. Pa. 1982)).[10]

To determine the appropriate amount of weight to be given to CBS's choice of forum, the Court must take into account the extent of CBS's and Defendants' contacts with the forum, including those relating to the cause of action. *Lou*, 834 F.2d at 739 (citing *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968)). "If the operative facts have not occurred within the forum and the forum has no interest in the parties or subject matter, [the plaintiff's choice of forum] is entitled to only minimal consideration."[11] *Id.* (citing *Pac. Car & Foundry Co.*, 403 F.2d at 954); *see also Windmere Corp.*, 617 F. Supp. at 10 ("where the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, [however,] the choice of forum is entitled to less consideration") (citing *Curtin v. Litton Sys.*, 365 F. Supp. 489, 490 (E.D. Pa. 1973); *Popkin v. Eastern Air Lines, Inc.*, 204 F. Supp. 426, 430 n.3 (E.D. Pa. 1962)).

Here, the operative facts involve an alleged agreement between CoreLogic and Experian for Experian to initiate Project Green and Experian's subsequent imposition of the Project Green program. Working backwards, Mr. Williams, who wrote the Project Green memoranda and circulated it through his emails, works in Orange County, California, as do six of the other Experian employees who received the Project Green memoranda and emails. There is no evidence that any of the other seven Experian and former Experian employees to have received the memoranda and

---

[10]While *Koster* involved a derivative shareholder's action that is not entirely analogous to the class action here, the plaintiffs in this case nonetheless share certain characteristics of the class in *Koster*. For example, as in *Koster*, where the shareholders were from all over the country, here, the putative class members include mortgage CRAs who are also located nationwide, according to both parties. Under the facts as alleged in the Complaint, each such putative class member would have an equal claim to venue in its state of residence. Thus, as in *Koster*, the instant matter may have properly been filed in numerous, different states.

[11]This implicates the fourth venue-transfer consideration.

emails have ever worked for Experian in the Southern District of Florida.  In addition, Experian is headquartered and has its principal place of business in Orange County, California.  Thus, Project Green strongly appears to have had its genesis in Orange County, California.

As for the alleged agreement preceding the institution of Project Green, while denying that they ever engaged in a conspiracy, Defendants posit that had such illegal conduct occurred, it would have happened in Orange County because (1) according to Mr. Nallathambi's Declaration, all four of the individuals at CoreLogic during the operative period, who had the responsibility for making decisions regarding CoreLogic's position about support of the tri-merged norm or entering the wholesale market as a fourth repository, work in Orange County, and CoreLogic has always been headquartered in Orange County; and (2) Experian is headquartered in Orange County and the Project Green initiative was apparently developed there.  In response, CBS argues that "Defendants cannot claim that the location of the wrongdoing requires this case to be transferred to another venue and at the same time claim that the wrongdoing never occurred."  D.E. 33 at 7.  There is no suggestion that any of the operative facts happened in the Southern District of Florida.

While it certainly seems logical, in light of the facts alleged by Defendants, that if any illegal agreement were reached, it would have occurred in Orange County, California,[12] the Court need not opine on the location where any such agreement might have occurred because the institution of Project Green — a critical event about which CBS complains — transpired in Orange County and there is no reason to believe that any of the operative facts at all happened here in the Southern

---

[12]At least one court has used as the location of the operative facts the place where it determined illegal conduct that was denied would have occurred, had it, in fact, happened.  *See Moghaddam*, 2002 WL 1940724 at *3 ("Any wrongdoing . . . would have occurred at [Defendant's] principle place of business . . . .").

District of Florida.

Nor does the Southern District of Florida enjoy any special interest in this litigation. Although CBS resides here, it employs a total of four individuals, and many, many more putative class members exist in other states.  Indeed, CBS does not point to a single other potential class member that resides in the Southern District of Florida.  And, while every state shares an interest in ensuring that antitrust violations do not occur in the wholesale report market since, ultimately, consumers all of the country would bear the increased resulting costs, neither party has made the Court aware of any greater interest that Florida may have than other states in this regard.  Thus, in light of the nationwide-class nature of this action, the fact that the operative facts occurred outside the Southern District of Florida, and the lack of any special stake that the Southern District of Florida has in this litigation, CBS's choice of forum is entitled to significantly less consideration.

Against this background, the Court notes that the majority of the witnesses, including apparently all of the most likely and necessary CoreLogic employees and former employees and many of the most likely and necessary Experian employees and former employees, based on the allegations in the Complaint,[13] work in Orange County, Florida.  Although CBS's owner avers that he and the other three employees of CBS are all "likely to be witnesses at trial," it is not obvious to the Court why that is so, except that the Court can understand that CBS might wish to present evidence of how it was affected by Project Green.  But why a single individual in a four-person firm would not be capable of presenting such evidence is not clear.  Moreover, neither the Complaint nor

---

[13]Several of these individuals are specifically named in the Complaint and its attachments. In addition, as set forth above, they include those individuals either involved with Project Green or in a position to make decisions relating to Project Green and the policies allegedly instigating it.

CBS's owner provides any reason to believe that any of CBS's employees have any knowledge that might shed light on whether a conspiracy, in fact, occurred.  Thus, while trial in Orange County would be less convenient for a CBS witness, it would be more convenient for numerous other apparently necessary witnesses.  The convenience of the witnesses is "a primary, if not the most important, factor in passing on a motion to transfer under § 1404(a)."  *Moghaddam*, 2002 WL 1940724, at *3 (citation and internal quotation marks omitted).

Also, because two of the CoreLogic witnesses who reside in Orange County are former employees of CoreLogic, it is also relevant that process would be available to compel their attendance at trial if necessary.  There should be no need to compel the attendance of witnesses who continue to work for any of the companies since the companies are parties to this case.  Therefore, the convenience of the witnesses and the availability of compulsory process favors Orange County.

Similarly, while CBS may have some relatively small amount of relevant evidence in its possession, nearly all of the relevant documents are likely to be found at Defendants' business locations.  Although some of these documents are in Texas, according to Experian, many are located in Orange County, at Experian's headquarters.  Likewise, "the vast majority" of CoreLogic's relevant documents are present at its headquarters in Orange County, thus favoring Orange County as a forum.  The Court nonetheless recognizes that the availability of such documents in electronic form renders this particular factor less important in the overall analysis.

As for the relative means of the parties, Defendants clearly enjoy much greater means than CBS, but if CBS is successful in obtaining class status, Defendants will have to litigate against numerous mortgage CRAs all around the country.  In addition, with the exception of attending a trial, the relative means of the parties is largely irrelevant because, in the absence of agreement otherwise,

depositions are held near the deponents' physical locations, regardless of where the action proceeds, and other discovery is conducted with equal ease from wherever a party may be located. Thus, from a financial standpoint, the largest reason that the venue matters is because that is where the trial will occur. Here, however, should a trial be necessary, it seems unlikely to last for more than just a few days, thereby limiting its financial impact.

With regard to the convenience of the parties, there is no question that the Central District of California would be far more convenient for Defendants than the Southern District of Florida, and the Southern District of Florida would be substantially more convenient for CBS than the Central District of California. But for the numerous other members of the putative plaintiff class, none of whom are located in the Southern District of Florida, this Court cannot find that the Southern District of Florida provides a more convenient forum than the Central District of California. Thus, for the majority of the putative plaintiff class, the Southern District of Florida does not have the advantage of convenience, whereas for both Defendants, convenience clearly favors the Central District of Florida.

Turning to the seventh consideration, both the Southern District of Florida and the Central District of California are capable of applying the applicable law, although the Court notes that the Central District of California has previously handled other extended litigation relating to the imposition of fees by the repositories on CRAs. *See Standfacts, supra*. Therefore, perhaps the scale for this factor tips ever so slightly towards the Central District of California.

Finally, trial efficiency likewise weighs in favor the Central District of California. Because the majority of the apparent witnesses are located there, the majority of witnesses should be able to appear to testify on short notice. If the trial were held in Fort Lauderdale, however, because of the

-46-

number of hours it takes to fly between Orange County and the Southern District of Florida, if the parties were surprised by the relatively short length of a witness's testimony, they might not be in a position to present additional witnesses with little notice. This could affect the flow and efficiency of the trial. In addition, the travel considerations, such as delays, cancellations, and other such problems, relating to so many of the witnesses were this case to proceed in Fort Lauderdale — all of which can wreak havoc on a trial schedule — dictate the preferability of the Central District of California. Likewise, to the extent that discovery disputes might require court involvement, because so many of the witnesses and documents are located in Orange County, venue in the Central District of California will allow for easier and prompter resolution of any such issues that might arise.

Overall, based on the totality of the circumstances, the Court finds that the interest of justice favors transfer of this action to the Central District of California, where Orange County is located. Accordingly, the Court grants Defendants' Motion to Transfer Venue.

### *IV.  Conclusion*

For the foregoing reasons, Defendants' Joint Motion to Consider Joint Motion to Transfer Venue Before Joint Motion to Dismiss [D.E. 30] is **DENIED**, and Defendants' Joint Motion to Dismiss [D.E. 20] and Joint Motion to Transfer Venue [D.E. 29] are **GRANTED**. Plaintiff shall have until **December 21, 2012**, to file an amended complaint, should it wish to do so. to **The Clerk of Court shall take all necessary actions to transfer this case immediately to the Central**

**District of California for all further proceedings**.

   **DONE and ORDERED** this 7th day of December 2012.


             _____
             ROBIN S. ROSENBAUM
             UNITED STATES DISTRICT JUDGE

copies:   The Honorable Barry S. Seltzer
       Counsel of Record